UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLIVIA ROBERTSON, et al.,

        Plaintiffs,                              Case No. 19-10266

v.

                                            HON. MARK A. GOLDSMITH

BREAKTHROUGH TOWING, LLC, et al.,

        Defendants.

_____/

**OPINION & ORDER**
**(1) GRANTING MOTIONS TO DISMISS FILED BY DEFENDANTS CVS HEALTH
CORPORATION AND WOODWARD DETROIT CVS, LLC (Dkt. 105), MCDONALD'S
CORPORATION (Dkt. 107), AND VIRGIRILLI MANAGEMENT COMPANY (Dkt.
110);**
**(2) GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON
THE PLEADINGS FILED BY CITY OF DETROIT (Dkt. 73) AND MOTION TO
DISMISS FILED BY CITY OF HAMTRAMCK (112); AND**
**(3) DENYING AS MOOT DEFENDANTS CVS HEALTH CORPORATION AND
WOODWARD DETROIT CVS, LLC'S FIRST MOTION TO DISMISS (Dkt. 60)**

Plaintiffs filed this class action alleging that a private towing company and its owner

engineered a scheme to illegally impound vehicles, charge exorbitant release fees, and bribe others

to assist in the effort. The scheme forms the basis of Plaintiffs' claims brought under 42 U.S.C. §

1983, and the Racketeer Influenced and Corrupt Organizations Act Claim, 18 U.S.C. 1962(c)

(RICO).

Before the Court are several motions to dismiss or for judgment on the pleadings filed by

two categories of alleged conspirators: (i) private companies from whose parking lots some

vehicles were towed, and (ii) municipalities whose police officers allegedly assisted in the tows

and violated Michigan's vehicle-impoundment statute as part of the scheme. For the reasons that

follow, the Court grants the motions to dismiss filed by (i) CVS Health Corporation and its

1

franchisee Woodward Detroit CVS, LLC (collectively, CVS) (Dkt. 105),[1] (ii) McDonald's Corporation (Dkt. 107), and (iii) McDonald's franchisee Virgirilli Management (Dkt. 110); and it grants in part and denies in part the City of Detroit's motion for judgment on the pleadings (Dkt. 73) and the City of Hamtramck's motion to dismiss (Dkt. 112). The Court also denies CVS's earlier motion to dismiss (Dkt. 60) as moot.

## I. BACKGROUND

Plaintiffs allege that Defendant Breakthrough Towing, LLC, a private towing company, implemented a "scheme" through which it illegally towed the vehicles of Plaintiffs and other similarly situated vehicle owners in Detroit and Hamtramck. 2d Am. Compl. ¶ 3 (Dkt. 50). Plaintiffs also name as Defendants Breakthrough's owner Michael Dickerson and Breakthrough's "alter ego" Magic Towing LLC (collectively, Breakthrough). Id. ¶¶ 11–13.

Breakthrough's authority to tow vehicles derives from the Michigan Vehicle Code, which allows for the towing of an "abandoned vehicle"—that is, "[a] vehicle that has remained on private property without the consent of the owner." Mich. Comp. L. § 257.252a(2)(a). A towing agency may take custody of an abandoned vehicle through either of two ways: (i) at the direction of a police agency, see § 257.252a(4), or (ii) at the request of the owner of the private property where the abandoned vehicle is located, see § 257.252a(10). Breakthrough's alleged scheme implicates only the latter scenario; Plaintiffs do not allege that any Breakthrough impoundment was effected at the request of the police, and they do not deny Detroit and Hamtramck's representations that the municipalities never held towing contracts with Breakthrough or requested its services, see Detroit Br. in Supp. Mot. at 4; Hamtramck Br. in Supp. Mot. at 1.

---

[1] Though Plaintiffs name CVS Caremark Corporation and CVS Pharmacy #8137 as Defendants, these Defendants submit that they should properly be identified as CVS Health Corporation and Woodward Detroit CVS, LLC, respectively. See CVS Mot. at 2.

2

Plaintiffs plead that Breakthrough's tows violated the Code in two ways: (i) Breakthrough purportedly impounded vehicles that were not "abandoned" but in fact were legally parked; for example, some vehicle owners were patronizing the businesses that owned the lots at the times of the tows, see, e.g., 2d Am. Compl. ¶¶ 15–16; and (ii) Breakthrough made tows from private lots that had inadequate signage, id. ¶¶ 74–75, which failed to satisfy the property owners' obligation to "post a notice" with specified requirements before authorizing a towing agency to impound a vehicle on their property, see § 257.252k.  Plaintiffs allege that employees of the private party Defendants accepted "bribes" or "kickbacks" in exchange for calling Breakthrough to initiate these illegal tows.  More specific allegations follow.

### A. Allegations Against Defendants McDonald's and Virgirilli

Plaintiffs allege that Breakthrough effected multiple illegal tows at Virgirilli's establishment—"McDonald's #20757"—located on Woodward Avenue in Detroit.  2d Am. Compl. ¶¶ 15–16.  Plaintiffs assert that agents of McDonald's and Virgirilli "report[ed] cars to be towed even when the cars were legally parked, and the car owners were patronizing McDonald's." Id.

Plaintiffs support these the claims with the allegations of two named Plaintiffs:

- Timothy Bates—a driver for the Door Dash food delivery service—states that he was parked legally in the McDonald's parking lot on August 2, 2018 to purchase food, and while he was inside, he noticed that his car was being attached to a Breakthrough tow truck. 2d Am. Compl. ¶¶ 126–132.  The driver told him to speak to an individual named "Alize" inside McDonald's, though when Bates asked to do so inside the restaurant, he was told that she had left for the day, and his car was towed.  Id. ¶¶ 132–135.

- Ashley Collins asserts that he parked his car in the McDonald's parking lot between 9:00 and 10:00 pm on February 5, 2019—without noticing any signage related to parking—and returned to discover that his car had been towed by Breakthrough.  ¶¶ 146–149.

- Further, Plaintiffs claim that many times, "the car owners who had their cars towed were in line to buy food, still eating, or in the bathroom, mere feet away, when their legally parked cars were towed."  Id. ¶¶ 15–16.

Plaintiffs allege that agents of McDonald's and Virgirilli accepted bribes in exchange for requesting illegal tows from Breakthrough.  Id. ¶ 10.  They submit:

> McDonald's <u>employees and managers received as much as $100 per tow</u> for calling in legally parked cars to be towed. In fact, <u>two Breakthrough tow trucks would routinely park in the alley</u> behind McDonald's #20757 . . . and <u>wait for calls</u> to come regarding legally parked cars in the McDonald's lot, which were then towed. . . .  <u>Dickerson would often pay over $1,000 per day to an "impound fund" that McDonald's employees and managers would share</u>. . . .

> The scheme was so comprehensive and systemic that when towing victims confronted the Breakthrough drivers in the process of towing their cars, the <u>drivers told the car owners to go back into McDonald's and ask for specific individuals</u>: "Mr. Senior" (allegedly a McDonald's manager), and "Alize" to discuss the impoundment.  The car owners were always informed by McDonald's agents, "There is nothing we can do."

Id. (emphasis added).

### B.  Allegations Against CVS

Plaintiffs also allege CVS's involvement in Breakthrough's scheme based on tows from the Woodward Detroit CVS establishment, located in Hamtramck, Michigan.  See id. ¶ 71.  CVS's employees allegedly "took bribes from Breakthrough in exchange for reporting cars to be towed even when the cars were legally parked or otherwise not given requisite legal notice before being deprived of their property."  Id. ¶ 17; see also id. ¶ 76.

To substantiate the claims against CVS, Plaintiffs rely on the allegations of Plaintiff Olivia Robertson.  Robertson alleges that, on or about April 5, 2018, she parked her car in the Woodward Detroit CVS, LLC parking lot—not noticing any signage relevant to towing displayed—and, after returning from patronizing a nearby bar ("Bumbo's"), she returned to find a Breakthrough driver in the process of attaching her vehicle to the tow truck.  Id. ¶¶ 73–81.

### C.  Allegations Against Detroit and Hamtramck

Named Defendants also include Detroit, Hamtramck, and unnamed John Doe police officers with the Detroit Police Department (DPD) and Hamtramck Police Department (HPD).  2d Am. Compl. ¶¶ 20–23.  Plaintiffs lodge two types of attacks at these municipal Defendants: (i) their police officers "aided and assisted" Breakthrough's predatory towing practices by allowing Breakthrough to effect tows that violated the Code, accepting bribes in return for the favor, see, e.g., id. ¶¶ 3, 10; and (ii) the officers failed to abide by the Code's required processes to provide vehicle owners with notice of the tows, see, e.g., id. ¶¶ 20–21.

### i.      Aiding and Assisting Illegal Tows in Exchange for Bribes

Plaintiffs allege that DPD and HPD officers "allowed" Breakthrough to impound vehicles in circumstances not allowed by the Code, often arriving on scene during impoundments but "prevent[ing]" vehicle owners from interfering with Breakthrough's practices.  Id. ¶ 10.  In Plaintiffs' view of the facts, Breakthrough provided the officers with bribes in exchange for their cooperation with these statutory violations.  Id. ¶ 10, 22–23.

These allegedly police-assisted tows violated the Code because the parking lots lacked the required signage and because the officers "illegally prevented car owners from retrieving their cars before their cars were removed by Breakthrough."  Id.  The latter claim relies in part on a separate subsection of the Code concerning "[r]emoval and custody of vehicles," which states: "if the owner . . . arrives at the location where the vehicle is located before the actual towing or removal of the vehicle, the vehicle shall be disconnected from the tow truck, and the owner or other person who is legally entitled to possess the vehicle may take possession of the vehicle and remove it without interference . . . ."  Mich. Comp. L. § 257.252d(2).  Detroit insists that this subsection is relevant only to police-authorized tows and so does not apply here, where all tows were initiated by private

parties.  See Detroit Br. in Supp. Mot. at 40.  Plaintiffs view Mich. Comp. L. § 257.252d(2) as applicable to all tows, and they allege that police officers assisted in its violation by allowing Breakthrough to continue towing vehicles after the arrival of vehicle owners.  See, e.g., 2nd Am. Compl. ¶ 10.

Plaintiffs also suggest that some tows were effected without any request of the property owner, a circumstance not authorized by Mich. Comp. L. § 257.252a.  Plaintiffs plead that the officers "allowed Breakthrough to decide when to impound vehicles" and "jointly decided with Breakthrough when to tow cars from private lots without the request or consent of the lot owner." 2nd Am. Compl. ¶ 10.

As to the liability of the municipalities themselves, Plaintiffs allege that Detroit and Hamtramck failed to train their police officers that vehicles parked on private lots could not be impounded in the circumstances described.  Id. ¶ 49.

Plaintiffs support their claims against the municipalities with the following assertions:

- Robertson alleges that she called the police when she discovered a Breakthrough driver in the process of towing her vehicle, which had been parked in the Woodward Detroit CVS, LLC parking lot, where Robertson did not see any relevant signage.  2nd Am. Compl. ¶¶ 73–84.  Three unidentified HPD officers arrived and allowed the tow to continue.  Id. ¶¶ 83–84.

- Brian Krawczyk (owner of Bumbo's Bar near CVS) and potential class members communicated to Plaintiffs' counsel that HPD officers have systematically allowed Breakthrough to continue with their tows even after owners arrive at the locations from which their vehicles are being towed.  Id. ¶¶ 210–224.

### ii.    Failure to Provide Notice

After every tow—whether police-authorized or privately requested—officers also have a statutory duty to initiate a process that provides vehicle owners with notice of the tow.  For private tows like those at issue here, the process begins with a call from Breakthrough.  "Before removing the vehicle from private property, the towing agency shall provide notice by telephone, or

otherwise, to a police agency having jurisdiction over the vehicle that the vehicle is being removed." Mich. Comp. L. § 257.252a(11).

Within 24 hours of receiving this notice, the police must enter the vehicle as abandoned in the law enforcement information network (LEIN), id., and notify the Michigan secretary of state—also through the LEIN network—that the vehicle has been taken into custody, providing specified details including the year and make of the vehicle, § 257.252a(12). Within seven days of receiving this notice, the secretary of state must send the vehicle owner "notice that the vehicle is considered abandoned" (Notice of Abandoned Vehicle form) by first-class mail or personal service, § 257.252a(13)(a), which notice must include certain information including: (i) "[t]he procedure to redeem the vehicle," § 257.252a(13)(a)(vi); (ii) "[t]he procedure to contest the fact that the vehicle is considered abandoned or the reasonableness of the towing fees and daily storage fees," § 257.252a(13)(a)(vii); and (iii) "[a] form petition that the owner may file in person or by mail with the specified court that requests a hearing on the custodian's action," § 257.252a(13)(a)(viii).

Within 20 days of receipt of the Notice of Abandoned Vehicle form, the owner may request a hearing to contest the vehicle's "abandoned" status or "the reasonableness of the towing fees and daily storage fees." § 257.252a(14)(a). This request is made "by filing a petition with the court specified in the notice." Id. The owner may secure release of the vehicle in advance of the hearing by either (i) "posting with the court a towing and storage bond in an amount equal to $40.00 plus the accrued towing and storage fees," or (ii) "paying a fee of $40.00 to the court plus the towing and storage fees instead of posting the towing and storage bond." Id. The court has 30 days following the request to schedule a hearing. Mich. Comp. Laws Ann. § 257.252f.

Plaintiffs allege that DPD and HPD officers systematically failed to enter towed vehicles into LEIN, and the municipalities failed to train them to do so, leaving many vehicle owners without notice of the impoundments.  See, e.g., 2d Am. Compl. ¶¶ 20–21.

Plaintiffs support their claims against Detroit with the following allegations:

- Plaintiffs' counsel was contacted by 138 vehicle owners whose cars were illegally towed in Detroit, only 33 of whom received the required Notice of Abandoned Vehicle form.  Id.  ¶ 56

- "[A] witness with direct knowledge of the practices of Breakthrough" informed them that, after Breakthrough had improperly towed Plaintiff Timothy Bates's vehicle from a McDonald's parking lot, an unidentified DPD officer received notice of the impound but "willfully failed to enter the car into the LEIN system as an abandoned vehicle." Id. ¶¶ 136–139.

- Plaintiffs make the same claim in regard to DPD officers' response to Breakthrough's towing of Plaintiff Ashley Collins's vehicle from the same McDonald's parking lot, id. ¶¶ 151–153, and in regard to DPD officers' response to Breakthrough's towing of Plaintiff Justin Kandah's vehicle from a public street, id. ¶¶ 169–173, 183–186.

Plaintiffs support their claims against Hamtramck with the following assertions:

- Plaintiffs' counsel was contacted by 12 vehicle owners whose cars were illegally towed in Hamtramck, none of whom received the required Notice of Abandoned Vehicle form.  Id. ¶ 56.

- After HPD arrived on the scene of the impoundment of Robertson's vehicle, Robertson never received a Notice of Abandoned Vehicle form from the secretary of state, allegedly due to the officers' failure to enter the vehicle into LEIN.  Id. ¶¶ 85–86.

- Plaintiff Karen Abke claims that she called HPD after her car was towed from a location in Hamtramck without visible towing-related signage on March 2, 2019.  Id. ¶¶ 190– 195.  Abke was informed by the HPD dispatcher that her vehicle was being held at the Breakthrough lot, but Abke never received a Notice of Abandoned Vehicle form, allegedly because the vehicle was never entered into LEIN.  Id. ¶¶ 195–199, 205.

- Plaintiffs allege that a representative of Hamtramck "admitted" to Plaintiffs that it had a policy of not entering of towed vehicles into LEIN.  Id. ¶ 21.  Plaintiffs submit that a Hamtramck city attorney stated in an email: "Abandoned vehicle notices were not sent because the people who had their cars poached by Breakthrough/Magic did not abandon their vehicles. . . . Although the statute defines abandoned to include 'a vehicle left on private property without the consent of the owner,' it does not require police departments to treat every vehicle towed from a private lot as abandoned."  Pl. Resp. to Hamtramck Mot. at 32 (Dkt. 122).

### D.  Plaintiffs' Causes of Action

Plaintiffs bring claims against all Defendants under 42 U.S.C. § 1983, alleging (i) violations of Fourteenth Amendment procedural due process, Compl. ¶¶ 230–244, (ii) violations of the First Amendment, id. ¶¶ 245–250, (iii) violations of the Fourth Amendment, id. ¶¶ 251–255, (iv) violations of the Eighth Amendment, id. ¶¶ 256–266, and (v) civil conspiracy, id. ¶¶ 271–274.[2]  They also bring a claim under RICO against all the private party Defendants.  Id. ¶¶ 275–285.

---

[2] Though the Plaintiffs' pleadings do not explicitly identify their civil conspiracy claim as one brought under § 1983, the Court understands that § 1983 provides the basis for this cause of action. Plaintiffs' civil conspiracy claim identifies the violation of "constitutional rights" as their alleged injury, 2d Am. Compl. ¶ 272—a claim that sounds in § 1983.  See, e.g., Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014).  If Plaintiffs intended to ground their civil conspiracy claim in Michigan law instead of federal law, they were required to plead an underlying tort, "as civil conspiracy is not an independently actionable tort."  Knight Indus. & Assocs., Inc. v. Euro Herramientas, S.A.U., No. 2:12-cv-14405, 2013 WL 3773373, at *5 (E.D. Mich. July 17, 2013) (citing Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003), aff'd, 693 N.W.2d 358 (Mich. 2005)) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort.") (punctuation modified, citation omitted).  CVS brought this point to Plaintiffs' attention, see CVS Br. in Supp. Mot. at 11 (Dkt. 109), and Plaintiffs responded not by identifying any relevant state-law torts, but instead by making the same argument that is central to their civil conspiracy argument throughout their briefing: that Defendants are state actors who conspired to violate constitutional rights, see, e.g., Pl. Resp. to CVS Mot. at 12–13 (arguing that Defendants "conspired with Breakthrough and Dickerson and acted under color of law for the purposes of § 1983," and not making any civil conspiracy argument independent of their § 1983 argument) (capitalization modified); Pl. Resp. to Detroit Mot. at 39–40 (Dkt. 89) (beginning their argument that Detroit participated in civil conspiracy by asserting that Detroit "acted under color of law" and conspired with "de facto state actors").  Because Plaintiffs have made clear that their civil conspiracy claim is based in the alleged violation of constitutional rights by state actors, the Court treats it as a § 1983 claim.

## II.  ANALYSIS[3]

The Court addresses the adequacy of Plaintiffs' pleadings on each of their claims in turn. After finding that it has subject matter jurisdiction, the Court considers Plaintiffs' claims against the private party Defendants, and then it turns to claims against the municipal Defendants.

### A.  Subject Matter Jurisdiction

As an initial matter, this Court has subject matter jurisdiction over Plaintiffs' federal claims.  Virgirilli argues that jurisdiction is lacking based on Mich. Comp. L. §257.252e(1), which grants jurisdiction to Michigan district and municipal courts to determine whether police officers, towing agencies, and private parties have complied with the Code.  Virgirilli Br. in Supp. Mot. at 2–7.  Virgirilli relies on Gilbert-Rutter v. Parkview Towers, which found that Mich. Comp. L. §§ 257.252e assigned exclusive jurisdiction to the state district court to adjudicate an owner's challenge to the tow of her vehicle.  No. 16-11010, 2016 WL 3913713, at *2 (E.D. Mich. July 20, 2016).

Gilbert-Rutter, however, concerned a single plaintiff challenging the one-time tow of a vehicle with expired plates—a matter more appropriately referred to the state court identified by

---

[3] The United States Court of Appeals for the Sixth Circuit explained the standards governing the review of motions to dismiss and motions for judgment on the pleadings:

> A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) generally follows the same rules as a motion to dismiss the complaint under Rule 12(b)(6).  A court evaluating that type of motion thus must follow the Supreme Court's changes to the pleading standards in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  Courts must accept as true all well-pleaded factual allegations, but they need not accept legal conclusions.  Iqbal, 556 U.S. at 678.  And the well-pleaded factual allegations must "plausibly give rise to an entitlement to relief."  Id. at 679.  Pleaded facts will do so if they "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.

Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 480 (6th Cir. 2020) (punctuation and citations modified, other citations omitted).

the Code.  Id.  Plaintiffs' claims in this case—alleging that a long-running scheme violated federal

statutes and constitutional rights—all "aris[e] under the Constitution, laws, or treaties of the United

States."  28 U.S.C.A. § 1331.  This Court has jurisdiction.  See, e.g., Carmen Auto Sales III, Inc.

v. City of Detroit, No. 16-12980, 2018 WL 1326295, at *3–4 (E.D. Mich. Mar. 15, 2018) (finding

that court had subject matter jurisdiction over towing dispute, explaining: "Congress—not a state

legislature—controls federal court jurisdiction. . . . Plus, nothing in § 257.252e(1) of the Michigan

Motor Vehicle Code limits a federal court's jurisdiction to hear federal claims. . . .").

### B.  Section 1983 Liability of Private Party Defendants

Plaintiffs assert multiple constitutional claims against CVS, McDonald's, and Virgirilli

under 42 U.S.C. § 1983.  These claims cannot stand both because (i) these entities are not state

actors, and because (ii) Plaintiffs do not plausibly allege that these Defendants' policies or customs

caused the asserted constitutional violations.

### i.       State Actor

Because CVS, McDonald's, and Virgirilli are private parties, they are liable under § 1983

only if they are "state actor[s]" that operated under "under color of law" such that their "private

conduct is fairly attributable to the state."  Moldowan v. City of Warren, 578 F.3d 351, 399 (6th

Cir. 2009) (punctuation modified, citations omitted).  There are four tests for determining whether

private conduct is fairly attributable to the state: (i) the public function test, (ii) the state

compulsion test, (iii) the nexus test, and (iv) the entwinement test.  Bey v. LVN Corp., No. 14-

13723, 2015 WL 4546752, at *4 (E.D. Mich. July 28, 2015) (citing Marie v. Am. Red Cross, 771

F.3d 344, 362 (6th Cir.2014)).  Independent of these four tests, private parties may also be liable

under § 1983 if they "willfully participate[d] in joint action with state agents" by joining a civil

conspiracy with state officials.  Memphis, Tenn. Area Loc., Am. Postal Workers Union, AFL-CIO

v. City of Memphis, 361 F.3d 898, 905 (6th Cir. 2004).  Plaintiffs insist that the nexus test, state compulsion test, and conspiracy framework are all sufficient bases on which to find the private company Defendants liable under § 1983.[4]

Plaintiffs present a novel theory for how the alleged conduct of employees of fast food restaurants and pharmacies is attributable to the state.  Plaintiffs do not allege that the private party Defendants had any direct contact with or communication with the police, or even that they knew that any state officials were involved in Breakthrough's supposed scheme.  For instance, none of the illegal tows presented by Plaintiffs features a police officer arriving at the private parties' establishments during business hours.  Rather, in Plaintiffs' view, Breakthrough acted in concert with and at the encouragement of DPD and HPD, and the private company Defendants then became state actors because they conspired with Breakthrough to receive their own "kickbacks."[5]

---

[4] See Pl. Br. in Supp. Resp. to CVS Mot. at 12–20; Pl. Br in Supp. Resp. to McDonald's Mot. at 16–23 (Dkt. 115); Pl. Br in Supp. Resp. to Virgirilli Mot. at 16–21 (Dkt. 117).

As to the elements of these three theories:

- "The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state."  Moldowan, 578 F.3d at 399 (punctuation modified, citation omitted).

- "[T]he nexus test requires a sufficiently close relationship (i.e. through state regulation or contract) between the state and the private actor so that the action may be attributed to the state."  Id. (punctuation modified, citation omitted).

- A § 1983 civil conspiracy occurs where "a private party has conspired with state officials to violate constitutional rights," which requires a showing that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed."  Revis v. Meldrum, 489 F.3d 273, 290 (6th Cir. 2007).

[5] See, e.g., Pl. Br in Supp. Resp. to CVS Mot. at 12–13 ("CVS, through their agents, acted under color of law by conspiring with Breakthrough and Dickerson, de facto state actors who were also acting under color of law . . . ."); Pl. Br in Supp. Resp. to McDonald's Mot. at 20 ("In negotiating and participating in a kickback scheme with other defendants acting under color of law, Breakthrough Towing and Michael Dickerson, where Defendant McDonald's agents and/or

In other words, Breakthrough made payments to the police, and Breakthrough made payments to employees of private companies—and so, submit Plaintiffs, the private companies are liable for violating the Constitution as if they were government actors.

Plaintiffs do not identify any cases where the nexus and state compulsion tests created state actors out of private companies based—not on their contacts with any state official—but instead on their relationship with another private company. This theory has no basis in law. Success on the state compulsion test requires some degree of communication, contact, or understanding between a state official and a private party to demonstrate that the state "exercise[s] such coercive power or provide[s] such significant encouragement . . . that in law the choice of the private actor is deemed to be that of the state." Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co., Inc., 780 F. App'x 197, 204–205 (6th Cir. 2019) (punctuation modified, citation omitted) (affirming finding that there was no legally sufficient basis for jury to find that private dental benefits manager was a state actor where only contacts with state were emails exchanged with state Medicaid program touching on decisions relating to manager's choice of providers).

The nexus test, too, requires contact between the state official and the private party demonstrating more than "[m]ere cooperation"—for example, that the state "directed or otherwise ordered" the private party's actions. Williams v. City of Detroit, No. 2:19-cv-12600-TGB, 2020 WL 4366073, at *5 (E.D. Mich. July 30, 2020) (granting motion to dismiss upon finding that entertainment event operator was not state actor under nexus test or other theories). The nexus and state compulsion tests are not satisfied when private entities act entirely independently of state

employees received kickbacks, Defendant McDonald's acted under color of law."); Pl. Br in Supp. Resp. to Virgirilli Mot. at 21 ("Detroit significantly encouraged Breakthrough and Dickerson, covertly if not overtly, to tow vehicles illegally and charge excessive fees, part of which was given to Defendant Virgirilli Management's agents and/or employees . . . .").

officials.  See Bey, 2015 WL 4546752, at *5 (finding that private mortgage lender with no alleged

contact with any government entity was not a state actor under any theory).

Plaintiffs' citations to out-of-circuit cases where towing companies were found to be state

actors are inapposite.  See Pl. Resp to CVS Mot. at 18.  These cases involved tows made at the

direct request of police officers or pursuant to criminal investigations—factors not present here.[6]

The fact that towing occurs does not make every entity that has some connection to the tow a

representative of the state.  In fact, case law in this circuit indicates that towing companies are

generally not state actors under the nexus and state compulsion theories—both at the summary

---

[6] See Smith v. Insley's Inc., 499 F.3d 875, 880 (8th Cir. 2007) (finding that a private towing company "was a state actor when it initially towed and stored the vehicle at the behest of the sheriff's office as part of an official criminal investigation," considering that (i) the company, "as the sheriff's contracted vendor for this service, . . . had a monopoly on sheriff towing"; and (ii) plaintiff's "representatives were told by various government officials that they could not retrieve [his] truck from [the company] due to the ongoing criminal investigation") (emphasis in original); Stypmann v. City & Cnty. of San Francisco, 557 F.2d 1338, 1341 (9th Cir. 1977) (finding that a towing company was a "willful participant in a joint activity with the State or its agents" sufficient to make it a state actor where, under state vehicle code, "[a] police officer ma[de] the initial determination that a car [would] be towed and summon[ed] the towing company" and "[t]he towing company tow[ed] the vehicle only at the direction of the officer") (punctuation modified, citations omitted); see also Soffer v. City of Costa Mesa, 607 F. Supp. 975, 978 (C.D. Cal. 1985), aff'd in part, 798 F.2d 361 (9th Cir. 1986) (rejecting defendant towing company's argument that it was not a state actor where it towed a vehicle "on orders from" a police department).

14

judgment stage[7] and on the face of the pleadings[8]—even when those companies tow vehicles pursuant to government contracts or at the express request of the police.  Further, regarding our specific context, Plaintiffs cite no cases sustaining, as plausible, a theory that private companies were state actors premised on their employees' corrupt bargain with a tow company, which in turn had a separate corrupt bargain with state officials.  These pleadings fail to pass the nexus and state compulsion tests.

Plaintiffs run into similar difficulties alleging that the private party Defendants are state actors as fellow members of a civil conspiracy.  This theory of § 1983 liability requires a plausible

---

[7] See, e.g., Carmen, 2018 WL 1326295, at *7–8 (finding that two private towing companies called by Detroit police officers to impound certain vehicles were not state actors liable under § 1983, explaining that plaintiffs had failed to establish "pervasive entwinement" considering factors including (i) the companies were only "two of about twenty companies with a towing contract with Detroit," and (ii) "the private towing companies did nothing more than fulfill their contractual obligations"); Bowersock v. City of Lima, Oh, No. 3:07-cv-730, 2008 WL 1767083, at *1–3 (N.D. Ohio Apr. 16, 2008) (finding that a towing contractor with the City of Lima that was "called out each time the City need[ed] a vehicle towed" was not a state actor liable under § 1983 for a particular tow made upon the police department's request, including because (i) under the state compulsion test, "no significant encouragement or coercion exists," as demonstrated by the fact that "Defendant's contract to tow vehicles for the City was voluntary"; and (ii) under the nexus test, even though "[a] patrolman for the City was present at the time the towing began[, d]irecting a towing company to tow a vehicle is not enough to establish a nexus between the state officer and the towing company").

[8] See, e.g., Partin v. Davis, 675 F. App'x 575, 586–587 (6th Cir. 2017) (finding that defendant towing company and its employees had no "pervasive entanglement" with county sufficient to make them state actors where they had a history of towing vehicles for the county and where they effected a tow at the request of a police deputy pursuant to an allegedly unlawful writ of execution of a civil judgment) (punctuation modified, citations omitted); Banks v. Fedierspiel, No. 5:10-CV-427-JBC, 2011 WL 1325046, at *5 (E.D. Ky. Apr. 1, 2011) (dismissing § 1983 claim against towing company based in allegedly unconstitutional tow, explaining: "Private towing companies with whom municipalities contract to tow and impound cars do not become state actors by performing their public contracts."); Griesser v. Pirkel's Towing Co., No. 106 CV 2904, 2007 WL 582386, at *2 (N.D. Ohio Feb. 20, 2007) (dismissing § 1983 claim against towing company based on a particular tow effected at police department's request, explaining: "There are no allegations in the complaint which reasonably suggest that [the company] could be considered to be a 'person acting under color of state law.'").

allegation that these Defendants "willfully participate[d] in joint action with state agents." Memphis, 361 F.3d at 905.

Plaintiffs fail to make any such allegation.  Plaintiffs cannot manifest § 1983 liability for private companies under a conspiracy framework without suggesting so much as a word or a wink with a public official.  There is no joint action here.  See In re Flint Water Cases., No. 20-12726, 2022 WL 957542, at *12 (E.D. Mich. Mar. 29, 2022) (dismissing claims that private defendants were state actors under a conspiracy theory where "there [was] very little that tie[d] Defendants to" the decision at issue made by the municipal government); Marshall v. Wayne Cnty., No. 2:19-CV-12515, 2021 WL 4972950, at *2–3 (E.D. Mich. Oct. 26, 2021) (granting dismissal where plaintiff failed to establish § 1983 liability of private doctor based on allegations that doctor conspired with county employees to "devise[] a scheme to illegally terminate Plaintiff's employment" because, "[e]ven if those allegations were true, there would be "no evidence from which to infer that the defendants acted in concert in so doing") (punctuation modified, citations omitted); Eckmeyer v. Brimfield Twp. Bd. of Trustees, No. 5:05-cv-2925, 2006 WL 1644377, at *4–6 (N.D. Ohio June 12, 2006) (granting defendant banks' motion to dismiss § 1983 conspiracy claims because "loose[]" allegations of a conspiracy supposedly including many state and private actors did not "allege any agreement or plan between the Bank Defendants and Brimfield Township or its officers").  And involvement with the state cannot be "willful" if the parties never knew the state was involved.  See Tahfs v. Proctor, 316 F.3d 584, 592 (6th Cir. 2003) (affirming dismissal of complaint alleging § 1983 liability of private parties, stating: "Most significantly, [plaintiff] never identifies the state court actors with whom the [defendants] allegedly conspired.").

Plaintiffs rely on Carmen, see Pl. Br in Supp. Resp. to CVS Mot. at 15–16, which states that a "corrupt conspiracy" involving "bribery on the part of private officials may lead to the private parties' § 1983 liability," Carmen, 2018 WL 1326295, at *8 (citing Dennis v. Sparks, 449 U.S. 24, 28–29 (1980) (finding that "a corrupt conspiracy involving bribery of the judge" created § 1983 for private parties who provided the bribe) (other citations omitted)).  Plaintiffs do allege that someone bribed state officials, but they do not allege that the private companies were aware of or involved in that conduct.  On the face of the allegations, these Defendants "ha[d] nothing to do with" it.  Carmen, 2018 WL 1326295, at *8 (finding that plaintiffs had failed to establish § 1983 liability for a private towing company based on allegations of a "bribery scandal" in a different township that "ha[d] nothing to do with this case involving the City of Detroit").

Criminal drug conspiracies provide some guidance for determining the reach of liability where various actors have different levels of involvement in a conspiracy.  In that context, "[t]he fact that [a defendant] engaged in drug activity" is insufficient to show participation in a conspiracy, as is "mere association with conspirators."  United States v. Gibbs, 182 F.3d 408, 422 (6th Cir. 1999) (vacating some conspiracy convictions and upholding others) (punctuation modified, citation omitted).  Rather, the defendants must have been "connected to the agreement, i.e., [they] participated in the conspiracy"—rather than "act[ed] independently," even if "associated with each other."  Id. at 422–423.

To the extent that Breakthrough had an agreement to conspire with police officers, there is no allegation that the private party Defendants joined the deal.  If the private parties were indeed engaged in a nefarious kickback scheme, they were "acting independently," id. at 423, not as "willful participant[s] in joint activity with the State or its agents," Tahfs, 316 F.3d at 590 (punctuation modified, citation omitted).  Plaintiffs' allegations provide no basis for inferring that

the actions of CVS and McDonald's employees can be "fairly attributable to the state." <u>Moldowan</u>, 578 F.3d at 399 (punctuation modified, citations omitted).  They are not liable under § 1983.

### ii.    Policy or Custom

Plaintiffs' § 1983 claims fail to reach the private party Defendants for another reason.  As McDonald's correctly observes, "'[u]nder § 1983, there is no <u>respondeat superior</u> or vicarious liability.'"  McDonald's Reply at 5 (Dkt. 93) (quoting <u>Gardner v. Evans</u>, 920 F.3d 1038, 1051 (6th Cir. 2019)) (punctuation modified, citations omitted).  Even if an entity is a state actor, a "private employer" is liable under § 1983 only if it maintained a "policy or custom" that "was the moving force behind the deprivation of the plaintiff's rights."  <u>Savoie v. Martin</u>, 673 F.3d 488, 494 (6th Cir. 2012) (punctuation modified, citation omitted).

Plaintiffs do not attempt to allege that any of McDonald's, Virgirilli, or CVS maintained a policy or custom that caused Plaintiffs' alleged harms.  They plead that CVS's "employees" and Virgirilli's "employees and managers" accepted bribes in exchange for informing Breakthrough of parked cars ripe for illegal towing.  Am. Compl. ¶¶ 76, 10.  Plaintiffs make no suggestion that the corporate parents or franchisees maintained a policy of encouraging their employees to personally line their pockets by exploiting the companies' customers.  Nor do Plaintiffs allege that the "moving force" behind their injuries is the companies' failure to train their employees not to accept personal payoffs to facilitate illegal vehicle impoundments.  McDonald's, Virgirilli, and CVS cannot be held liable under § 1983 based only on the supposed actions of their employees.  <u>See</u> <u>Savoie</u>, 673 F.3d at 494–495 (affirming dismissal of § 1983 claims against limited liability company where plaintiff did "not allege that a policy or practice at [defendant company] was the moving force behind his claim" including because plaintiff's "failure to train" theory did not allege the company's "deliberate indifference to the rights of persons with whom the employees come

into contact") (punctuation modified); <u>Durham v. Niffenegger</u>, No. 1:18-cv-0091, 2019 WL 1050018, at *6 (S.D. Ohio Mar. 5, 2019), <u>report and recommendation adopted</u>, 2019 WL 1367913 (S.D. Ohio Mar. 26, 2019) (dismissing § 1983 claims against Walmart where plaintiff did "not allege that a Walmart policy or custom led to the violation of his constitutional rights").

### C.  RICO Claims Against Private Party Defendants

Similarly, Plaintiffs have failed to plausibly allege that the Defendant corporate entities are liable for their employees' alleged RICO violations.  An employer is vicariously liable for the conduct of its employee only if the conduct was "committed by an employee within the scope of his or her employment."  <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 756 (1998).  An employee acts within the scope of employment when his or her conduct is "'actuated, at least in part, by a purpose to serve the [employer],'"—that is, when the employee's action "benefits the employer."  <u>Id.</u> (quoting Restatement (Second) of Agency § 228 (1958)) (brackets in <u>Burlington</u>).

"[O]rdinary principles of <u>respondeat superior</u>" apply to RICO claims, and so an employer is liable for its employees' RICO violations only if the employer benefitted from those acts.  <u>Davis v. Mut. Life Ins. Co. of New York</u>, 6 F.3d 367, 379–380 (6th Cir. 1993) (finding employer liable for employees' actions under RICO where plaintiffs "presented abundant evidence that [defendant employer] actively promoted and sponsored the scheme, and plainly benefitted from it through the resultant increase in its corporate income"); <u>see also</u> <u>Fremont Reorganizing Corp. v. Duke</u>, 811 F. Supp. 2d 1323, 1339 (E.D. Mich. 2011) (explaining that <u>Davis</u> allows "imposition of [RICO] liability vicariously on corporate 'persons' on account of the acts of their agents, particularly where the corporation benefited by those acts") (punctuation modified); <u>Gen. Motors Corp. v. Ignacio Lopez de Arriortua</u>, 948 F. Supp. 670, 682 n.9 (E.D. Mich. 1996) (finding employer liable under

RICO and citing <u>Davis</u> for the proposition that "vicarious liability is appropriate [under RICO] where the corporation benefitted from the scheme").

The entirety of the activity underlying Plaintiffs' RICO claims—individuals' alleged facilitation of illegal tows by calling Breakthrough to identify target vehicles—is attributed to "employees and managers" of the private party Defendants.  2d Am. Compl. ¶¶ 76, 10.  As alleged by Plaintiffs, any financial benefit flowed solely to those individuals.  <u>See</u> <u>id.</u> ¶¶ 15–16 (stating that McDonald's and Virgirilli's "employees and managers received as much as $100 per tow for calling in legally parked cars to be towed"); <u>id.</u> (alleging that Dickerson made payments "to an impound fund that [McDonald's and Virgirilli's] employees and managers would share"); <u>id.</u> ¶ 18 (claiming that CVS's "agents took bribes from Breakthrough in exchange for reporting cars to be towed. . .").  These allegations allow for no inference that McDonald's, Virgirilli, or CVS "benefitted by those acts."  <u>Fremont</u>, 811 F. Supp. 2d at 1339.  To the contrary, it is far more plausible that these Defendants' businesses suffered from rogue employees lining their pockets at the expense of Defendants' customers and the resultant loss of customer good will.

Confronted by McDonald's arguments on agency, Plaintiffs assert that "[t]he ability of McDonald's agents to receive benefits/kickbacks was accomplished by their apparent authority to enter into contracts on behalf of McDonald's."  Pl. Resp. to McDonald's Mot. at 29.  Further, submit Plaintiffs, "[w]hen Virgirilli Management and McDonald's employees . . . received other benefits or kickbacks from Breakthrough Towing, it essentially became a term and condition of their employment."  <u>Id.</u> at 32.  These arguments are without merit.  Liability under a theory of apparent agency requires a showing that "it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal."  <u>Deschamps v. Bridgestone Americas, Inc. Salaried Emps. Ret. Plan</u>, 840 F.3d 267, 279 (6th Cir. 2016).  Plaintiffs fail to explain how the

private company Defendants could be liable to unsuspecting private citizens because Breakthrough thought that corporate and franchisee leadership had authorized their employees to engage in parking lot towing schemes, nor how Breakthrough could reasonably come to such a conclusion. These wild grasps at a theory of liability—like the suggestion that under-the-table bribes were a term of employment—are untenable.

The alleged actions of the private party Defendants' employees cannot plausibly be alleged to have been "taken within the scope of employment, that is, with intent to benefit the employer." D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 967 (7th Cir. 1988) (finding no RICO liability for employer based on scheme that "cannot be characterized as an action intended to benefit [employer]").  There is no merit to the RICO claims against these Defendants.  Id.

Plaintiffs have failed to state a claim against the private party Defendants.  The motions to dismiss filed by CVS, McDonald's, and Virgirilli are granted.  The Court turns to claims against the municipal Defendants, beginning with the procedural due process claim.

### D. Procedural Due Process Claims Against Municipal Defendants

To state a procedural due process claim, Plaintiffs must (i) identify a life, liberty, or property interest protected by the Due Process Clause; (ii) allege that they were deprived of that interest; and (iii) plead that the state did not afford them adequate procedures before or after the deprivation.  See Chandler v. Vill. of Chagrin Falls, 296 F. App'x 463, 469 (6th Cir. 2008).[9]

---

[9] As to the third step of the inquiry, a determination of what process is due requires a consideration of:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Plaintiffs allege that Detroit, Hamtramck, and their police officers violated Plaintiffs' due process rights based on their willful and self-profiting failure to enforce procedures that accompanied the towing of Plaintiffs' vehicles. Plaintiffs are correct that they have "a significant property interest in their vehicle[s]," of which they were deprived when their vehicles were towed. Brite Fin. Servs., LLC v. Bobby's Towing Serv., LLC, 461 F. Supp. 3d 549, 559 (E.D. Mich. 2020) (granting declaratory judgment on Plaintiffs' claim that Mich. Comp. L. § 257.252d—allowing police to wait seven days before entering vehicles that were towed at direction of police into LEIN—violated their procedural due process rights). The question, then, is whether Plaintiffs have adequately alleged that they were denied the process due to them. Considering the following theories presented by Plaintiffs, the Court finds that they have plausibly stated a procedural due process claim against Detroit, Hamtramck, and the John Doe officers.

### i. Absence of Notice Due to Failure to Enter Vehicles Into LEIN

Plaintiffs allege that the failure of the municipal Defendants to enter their vehicles into LEIN constituted a violation of their due process rights. Plaintiffs insist that receipt of the Notice of Abandoned Vehicle form—triggered by entry of their vehicles into LEIN—is the only notice that vehicle owners receive of their towed vehicles and of their right to contest the tows, and many Plaintiffs have not been receiving notice. Pl. Resp. to Detroit Mot. at 6–12.

The Court agrees that these allegations suffice to state a procedural due process claim. The Brite court found a procedural due process violation based on a less egregious allegation: not that the police failed to enter vehicles into LEIN, but that they waited seven days to do so (per a separate provision of the Code). Brite, 461 F. Supp. 3d at 560–561. There, the private interest at stake— "use of a vehicle," and "the risk of erroneous deprivation" of that interest—weighed more heavily than the government's "low" interest in taking its time to make entries into LEIN. Id. at 561.

22

These interests tip even further in Plaintiffs' favor here, where they allege that Defendants never made the required LEIN entries at all.

Municipal Defendants argue that Plaintiffs were not deprived of due process—even if the vehicles were not entered into LEIN—because Plaintiffs could have challenged the tows without receipt of the Notice of Abandoned Vehicle form, either at the hearings provided by the Code or through a conversion lawsuit.  Detroit Br. in Supp. Mot. at 27–28; Hamtramck Br. in Supp. Mot. at 10–11.  These arguments are unavailing.  Even if some enterprising individuals have managed to challenge improper tows in court without receiving the Notice of Abandoned Vehicle form, in general, "[w]ithout notice of the tow, the owner has no means of retrieving the vehicle."  Brite, 461 F. Supp. 3d at 561.  Because Plaintiffs have plausibly alleged that the municipal Defendants failed to abide by the process designed to furnish vehicle owners with this notice, Plaintiffs' procedural due process claim cannot be dismissed at this stage of the proceedings.  See id. at 562.

### ii. Denial of Prompt Hearing and Setting of Excessive Bond

Plaintiffs also argue that they were denied their constitutional right to a prompt hearing, since Michigan law allows a delay of 38 days before a car owner can obtain judicial review—that is, 24 hours between the tow and entry into LEIN, seven days between entry into LEIN and the secretary of state's delivery of notice and a form petition, and an additional 30 days allowed to the court to grant a hearing after the vehicle owner files the petition.  See Pl. Br. in Resp. to Detroit Mot. at 21–22.

The court in Brite considered a similar challenge to the Code, and it found that—even if vehicle owners wait weeks for a hearing—their opportunity to obtain release of their vehicles by posting bond satisfies the requirements of due process.  Brite, 461 F. Supp. 3d at 560 (citing Mich. Comp. L. § 257.252a(6) ("An owner who requests a hearing may obtain release of the vehicle by

posting a towing and storage bond in an amount equal to the $40.00 plus the accrued towing and storage fees with the court."); Breath v. Cronvich, 729 F.2d 1006, 1011 (5th Cir. 1984) ("[B]y obtaining an appearance bond, a person can have possession of his car until a hearing on the merits of the traffic ticket is held.  This bond procedure, combined with the hearing on the merits of the ticket, affords adequate due process protection.")).  Thus, "the timing of the statutory hearing does not violate due process" where a vehicle owner may secure release in advance of the hearing by posting bond.  Id. at 560.

Relatedly, Plaintiffs allege that they were denied access to "'an impartial arbiter'" because the bond amount is tied to the towing and storage fees, and Breakthrough set the storage and towing fees.  See Pl. Br. in Resp. to Hamtramck Mot. at 20–22; Pl. Br. in Resp. to Detroit Mot. at 19–20 (quoting Goldberg v Kelly, 397 US 254, 271 (1970)) (finding that city's procedures for terminating public assistance payments to welfare recipients violated due process, noting that "an impartial decision maker is essential," and further explaining that an official who participated in making a decision should not be responsible for reviewing challenges to that decision).  Plaintiffs argue that the towing and storage fees were exorbitant—often totaling upwards of $400 for tows of only a few miles.  Id.  They state that the municipal Defendants "chose" this practice of improperly delegating the discretion to determine the bond amount to Breakthrough rather than establish towing and storage fees themselves.  Pl. Resp. to Detroit Mot. at 38; Pl. Br. in Resp. to Hamtramck Mot. at 20 (citing Mich. Comp. L. § 257.252a(14) (mentioning that towing and storage fees may be "established by contract with the local governmental unit or local law enforcement agency")).  In response, the municipal Defendants disclaim any responsibility for setting Breakthrough's fees.  See, e.g., Hamtramck Reply at 3 (Dkt. 127).

24

The bond amount that vehicle owners are required to pay to obtain the release of their vehicles is set by the Code.  See Mich. Comp. L. § 257.252a(6) (setting bond at "$40.00 plus the amount of the accrued towing and storage fees").  The municipal Defendants have no power to change a bond amount established by statute.  Plaintiffs do not argue that the statute itself is unconstitutional (and precedent suggests that it is not).[10]  Instead, Plaintiffs allege that their due process rights were violated because the municipal Defendants "allowed Breakthrough to set the towing and storage fees, and thus the bond."  2d Am. Compl. ¶ 238.  But these Defendants had no choice but to comply with the Code.  Plaintiffs cite the municipal Defendants' ability to set towing fees by contract, but the section of the Code they cite explicitly refers to "[t]he daily storage rate established by contract or agreement with the law enforcement agency or unit of government that authorized the towing and storage of the vehicle."  Mich. Comp. L. § 257.252i(a) (emphasis added).  Detroit and Hamtramck had no contract or agreement with Breakthrough, and this lawsuit does not concern tows authorized by the police; whatever authority Breakthrough had to impound vehicles derived from private land-owner requests under Mich. Comp. L. § 257.252a(10).

Further, Breakthrough is not an "arbiter" and has no say in whether a vehicle owner prevails at the hearing.  The "neutral arbiter" is the court, and if the court determines that the vehicle

---

[10] Brite considered a due process challenge to the Code's requirement that an owner either pay the towing and storage fees or post a bond in the same amount before he or she is entitled to a hearing. 461 F. Supp. 3d at 561–562.  Weighing the factors set out in Mathews, 424 U.S. 319 (1976), the court found that this statutory requirement does not violate due process, explaining: "courts have consistently found that pre-payment requirements are constitutional so long as there is an opportunity to post a bond in the same amount." Id. at 562 (citing Breath, 729 F.2d at 1011; Hale v. Tyree, 491 F. Supp. 622, 626 (E.D. Tenn. 1979)) (other citation omitted).  In making this determination, the Brite court found that "the risk of an erroneous deprivation of the private property" was "low," stating: "Once the bond is posted or fees paid, petitioners are afforded a hearing in the 36th District Court before a neutral arbiter to determine the reasonableness of the tow and fees, which must be scheduled within thirty days of the request for hearing.  If the court determines the owner has been overcharged, the owner receives the fees back in the amount they have been overcharged." Id.

impoundment was improper, then the vehicle owner wins the release of his or her bond.  See Brite, 461 F. Supp. 3d at 562.  Plaintiffs have no due process claim against the municipal Defendants on this theory.

### iii. Violation of Code's Notice Requirements

Plaintiffs also argue that police officers failed to follow the Code's notice requirements—specifically, that the police allowed Breakthrough to tow vehicles from private lots even though the lots did not maintain the signage required by the Code.  See, e.g., Pl. Resp. to Hamtramck Mot. at 22–24.[11]  Plaintiffs submit that, where they "'contend[ they were] denied due process because Defendant[s] failed to follow the specified procedures'" prescribed by state statute, "'[t]hese facts are sufficient to state a claim that Plaintiff[s'] due process rights were violated.'"  Id. at 23 (quoting N.I.P.P. Royal Oak, LLC. v. City of Royal Oak, 420 F. Supp. 2d 791, 798 (E.D. Mich. 2006) (denying motion to dismiss due process claim premised on city's failure to abide by its own procedures in effectively suspending or revoking permit)).

Detroit disclaims any responsibility for tows effected by Breakthrough, submitting: "There is no evidence that the City of Detroit was made aware of whether the parking lots from which Breakthrough towed vehicles were posted with information required by [Mich. Comp. L. §] 257.252k."  See Br. in Supp. Detroit Mot. at 23–26.  Hamtramck views "alleged technical

---

[11] Plaintiffs also reference their understanding that Defendant officers violated § 257.252d(2) of the Code by allowing Breakthrough to continue with tows after the arrival of vehicle owners on the scene rather than "disconnect[ the vehicles] from the tow truck." § 257.252d(2).  Detroit insists that the entirety of § 257.252d applies exclusively to police-authorized tows—not private tows like those effected by Breakthrough—noting that each other sub-section in this provision explicitly refers to tows authorized by a "police agency."  See Detroit Br. in Supp. Mot. at 39–40.  Detroit also concedes that this section is "hardly a model of clarity" and admits that its counsel has previously interpreted § 257.252d to apply to private property impounds.  Id. at 40 n.9.  The Court finds that Plaintiffs have plausibly stated a procedural due process claim regardless of the proper interpretation of § 257.252d(2), and it declines to resolve this question at this stage.

violations of Michigan's towing statute" as insufficient to create a constitutional claim, arguing that "'[t]he violation of a right created and recognized only under state law is not actionable under § 1983.'"  Br. in Supp. Hamtramck Mot. at 9 (quoting Jones v. Union Cnty., Tenn., 296 F.3d 417, 429 (6th Cir. 2002) (punctuation modified, citation omitted) (finding no cognizable substantive due process claim under § 1983 where defendant county failed to timely serve ex parte protection order on plaintiff's ex-husband in accordance with state law, after which ex-husband shot plaintiff); see also id. (citing Harrill v. Blount Cnty., Tenn., 55 F.3d 1123, 1125 (6th Cir. 1995) (finding no procedural due process claim based on booking officer not allowing plaintiff to telephone father after arrest, allegedly in violation of state law)).

Plaintiffs have a protected property right in the use of their vehicles.  Brite, 461 F. Supp. 3d at 560.  The statute that Defendants allegedly violated was specifically designed to provide "notice" in advance of the deprivation of this right.  Mich. Comp. L. § 257.252k.  Not every violation of a state statute leads to a procedural due process claim, but this cause of action may arise from state officials' non-compliance with state laws that protect recognized rights.  See N.I.P.P., 420 F. Supp. 2d at 798; see also I Win. You Win. Irwin LLC v. Casey's Pub, Inc., No. 18-11151, 2018 WL 5307621, at *3 (E.D. Mich. Oct. 26, 2018) (denying motion for judgment on pleadings of procedural due process claim against officer who ordered plaintiffs to leave building following termination of lease—in violation of Michigan statute that established "a protected property interest in the leased building"—despite officer's defense that he "did not knowingly attempt to violate the law").

Despite Defendants' protestations that Plaintiffs have not offered "proof" of their claims, at this stage of the proceedings, the Court accepts Plaintiffs' well-pleaded allegations as true.  See Bates, 958 F.3d at 480.  Plaintiffs plead that police officers actively participated in Breakthrough's

scheme to tow vehicles in violation of the Code, including by arriving on the site of tows and preventing vehicle owners from interfering with those improper tows.  Because such conduct arguably deprives Plaintiffs of their property rights, the Court finds, at this stage, that Plaintiffs' allegations are "sufficient to state a claim that Plaintiff[s'] due process rights were violated." N.I.P.P., 420 F. Supp. 2d at 798.

### E.  First Amendment Claims Against Municipal Defendants

Plaintiffs allege that the municipal Defendants violated the First Amendment by conspiring to refuse to provide the notice necessary for a hearing and by conspiring to allow Breakthrough to set excessive bond amounts, thus precluding their access to judicial review.  Pl. Resp. to Detroit Mot. at 35.  However, Plaintiffs do not cite any authorities to support this claim, instead referring the Court back to arguments made in the context of their due process claims.  Id.; see also 2d Am. Compl. ¶¶ 245–250.  "It is not the court's responsibility to craft winning legal arguments for" the parties.  United States v. Mungarro, No. 07-20076, 2020 WL 1933816, at *3 (E.D. Mich. Apr. 22, 2020).  This claim is dismissed.

### F.  Eighth Amendment Claims Against Municipal Defendants

Plaintiffs also bring an Eighth Amendment claim, referring again to their allegations that they were forced to pay excessive bonds to recover their vehicles.  Pl. Resp. to Detroit Mot. at 36–39.  The Court understands that Plaintiffs rely on the Excessive Fines Clause of the Eighth Amendment, which states that "excessive fines" shall not be "imposed," U.S. Const. amend. VIII—though Plaintiffs do not so specify, nor cite any Eighth Amendment case law in support of this argument, see, e.g., Pl. Resp. to Detroit Mot. at 37 (citing Goldberg, 397 U.S. at 271 (finding procedural due process violation)).

The Excessive Fines Clause "guards only 'against abuses of [the] government's punitive or criminal-law-enforcement authority.'" F.P. Dev., LLC v. Charter Twp. of Canton, Michigan, 16 F.4th 198, 209 (6th Cir. 2021) (quoting Timbs v. Indiana, 139 S. Ct. 682, 686 (2019)). Its protections apply to "a monetary demand that is retributive or deterrent and thus intended to punish," not a "wholly remedial" demand "that is related only to damages sustained by society or to the cost of enforcing the law." Id. (finding that ordinance requiring permits and payment of fees for removal of trees did not implicate Eighth Amendment) (punctuation modified, citations omitted). To the extent that Plaintiffs attack the statutory scheme that provides for the payment of bonds linked to towing and storage fees, the purpose of the Code is "not punitive, so it does not implicate the Eighth Amendment." Id. Plaintiffs have failed to state an Eighth Amendment claim.

### G. Fourth Amendment Claims Against Municipal Defendants

Plaintiffs argue that the municipal Defendants conspired with Breakthrough to unreasonably seize Plaintiffs' legally parked vehicles in violation of the Fourth Amendment. See Pl. Resp. to Detroit Mot. at 35. They submit that a public official's seizure of a vehicle in violation of statutory protections is unreasonable and offends the Fourth Amendment. Id. (citing Livingston v. Luken, 151 F. App'x 470, 475 (6th Cir. 2005) (affirming the denial of a motion for judgment on the pleadings on a Fourth Amendment claim where plaintiff alleged that an officer had improperly identified his car as "abandoned," resulting in its tow and ultimate demolition, explaining: "a public official's seizure under the authority of the statute of an automobile that does not meet the statute's requirements for seizure would clearly be unreasonable for Fourth Amendment purposes"). Detroit, in contrast, frames the "seizures" as private party action, asserting: "'Even a wrongful search or seizure by a private party does not violate Fourth

Amendment rights . . . .'"  Detroit Br. in Supp. Mot. at 33–34 (quoting <u>United States v Morgan</u>, 744 F2d 1215, 1218 (6th Cir. 1984)).

As discussed, Plaintiffs have alleged more than private party action; they have alleged police participation.  They plead that police officers "arrived at the scene" of ongoing tows and—despite the fact that the tows were unlawful under the Code, including because of the "lack of noticed required by law"—they "prevented" vehicle owners from retrieving their cars and informed the owners that their "vehicle[s] had to be towed by Breakthrough."  2d Am. Compl. ¶ 83 (capitalization modified); <u>see also</u> <u>id.</u> at ¶¶ 22–23 (alleging that DPD and HPD officers "prevent[ed] the rightful owners and/or authorized users from taking possession of their property," "actively assist[ed] Breakthrough in taking the property despite the lack of notice required by law," and "aid[ed] and encourage[ed] the seizure of vehicles when the Code's seizure requirements were not met").  Plaintiffs have thus alleged that the John Doe officers "knowingly allowed [the] seizure[s] . . . in reckless disregard of [the statute's] requirements," which suffices to state a claim that the officers "violated [Plaintiffs'] clearly established Fourth Amendment right to be free from unreasonable seizures."  <u>Livingston</u>, 151 F. App'x at 476.  This claim survives a motion to dismiss. <u>Id.</u>

### H. Civil Conspiracy

For Plaintiffs to state a claim for a civil conspiracy, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant."  <u>Memphis</u>, 361 F.3d at 905 (punctuation modified, citation omitted) (denying motion to dismiss where complaint adequately alleged civil conspiracy as "'an agreement'" between police officers and private actors "'to deprive [plaintiff union] of its rights, privileges and

immunities'" by "'conferr[ing]'" and conspiring "'to direct police officers to harass, threaten and intimidate the plaintiff'").

Plaintiffs allege that "there was an agreement, express or implied, by Defendants to violate Plaintiffs' constitutional rights by the unlawful actions of taking their property without due process" and by "unreasonably seizing their vehicles." Am. Compl. ¶ 272. Detroit argues that the allegations of civil conspiracy fail for being entirely vague, speculative, and conclusory. Detroit Br. in Supp. Mot. at 44–45. Hamtramck similarly argues that allegations that HPD officers conspired with Breakthrough and received bribes are entirely speculative. Hamtramck Mot. at 17–19.

Casting Plaintiffs' arguments as "speculative" is insufficient for Defendants to meet their burden at this stage of the proceedings. Plaintiffs allege that Breakthrough made an agreement with members of DPD and HPD to allow the towing company to impound vehicles in violation of statutory protections—thus plausibly alleging overt acts that caused injuries in the form of violations of Plaintiffs' Fourteenth Amendment and Fourth Amendment rights. These allegations suffice to state a civil conspiracy claim against the police officer Defendants. Memphis, 361 F.3d at 905. To the extent that Plaintiffs attempt to wrap the municipalities of Detroit and Hamtramck into the conspiracy, however, these allegations fail, for the reasons that follow.

### I. **Monell** Liability

A municipality is liable under § 1983 where "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, Oh. v. Harris, 489 U.S. 378, 385 (1989) (citing Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694 (1978)). "[T]he inadequacy of police training may serve as the basis for § 1983

liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388.

As to the Fourteenth and Fourth Amendment claims, Plaintiffs allege that the municipal Defendants systematically failed "to train their police officials about the Code's requirements for impounding vehicles," including "the Code's requirement that every impounded vehicle be entered into the LEIN system . . .," 2d Am. Compl. ¶ 268, as well as the Code's requirements that adequate signage be in place before private agencies effect a tow and that vehicles be detached from tow trucks upon the arrival of vehicle owners, Pl. Resp. to Detroit Mot. at 30–32; Pl. Resp. to Hamtramck Mot. at 35. Plaintiffs allege various occasions on which police arrived on the sites of the improper tows and validated Breakthrough's actions. Plaintiffs also identify multiple tows that did not result in the entry of their vehicles into LEIN—even though the police were apparently aware of the tows—as well as representations from city officials that entry into LEIN was not required.

These allegations plausibly allege that Detroit and Hamtramck maintained policies of failing to train their officers on the Code's requirements, resulting in "deliberate difference" toward the ongoing violations of Plaintiffs' constitutional rights: namely, the rights to receive due notice upon deprivation of their property under the Fourteenth Amendment and to be free from unreasonable seizures of their vehicles under the Fourth Amendment. These pleadings survive a motion to dismiss. See Burkette v. Waring, No. 10-10230, 2010 WL 2572930, at *4 (E.D. Mich. June 22, 2010) (denying motion to dismiss as to county's liability for § 1983 claims where plaintiff alleged that "the failure to adequately train Oakland County deputies as to the correct procedures for legal traffic stops and arrests" caused constitutional harms).

The municipal Defendants protest that any illegal tows were carried out by Breakthrough, not by their police officers, and that they cannot be held liable for failing to prevent Breakthrough from breaking the law. Hamtramck Br. in Supp. Mot. at 20; Detroit Br. in Supp. Mot. at 38. These arguments miss the mark. Plaintiffs allege that police regularly arrived at the scene of illegal tows and validated Breakthrough's illicit activity with the imprimatur of their presence. And Defendants cannot dispute their duty to enter the vehicles into the LEIN system.[12] Plaintiffs plausibly allege that these supposed statutory violations were caused by Detroit and Hamtramck having failed to properly train their officers on the Code, thus demonstrating "deliberate indifference" to the constitutional rights that those statutes served to protect. Canton, 489 U.S. at 385 (1989). Plaintiffs may maintain their Fourteenth and Fourth Amendment claims against the municipal Defendants.

The civil conspiracy claim, however, does not reach Detroit or Hamtramck. To establish civil conspiracy liability for a municipal entity under § 1983, Plaintiffs must show that the municipal entity itself had involvement in the conspiracy, not merely rely on a theory of respondeat superior. See Bauss v. Plymouth Twp., 408 F. Supp. 2d 363, 369 (E.D. Mich. 2005), aff'd, 233 F.

---

[12] Detroit also points to its Standard Operating Procedures for Private Impounds (Dkt. 55-9) and police manual (Dkt. 55-8) to demonstrate that it did train its officers to enter private impounds into the LEIN system. Detroit Br. in Supp. Mot. at 38–39. The Court considers this argument premature. Plaintiffs have plausibly alleged—regardless of Detroit's on-paper policies—that the police department's custom was to disregard the mandate that they enter towed vehicles into LEIN. Detroit's contrary characterization of its policy-in-practice is better suited for argument at the summary judgment stage. See, e.g., Blake v. City of Lompoc, No. cv-16-6095 PSG(JC), 2017 WL 3275883, at *7 (C.D. Cal. June 29, 2017), report and recommendation adopted, 2017 WL 3269070 (C.D. Cal. July 31, 2017) (granting summary judgment to municipal defendants where police department's "custom" as alleged by plaintiffs conflicted with its "written policy manual"); Sanford v. Bunts, No. 14-CV-566-JPG-SCW, 2016 WL 11269315, at *11 (S.D. Ill. Dec. 19, 2016), at *11 report and recommendation adopted sub nom. Sanford v. Madison Cnty. Jail, No. 14-CV-566-JPG-SCW, 2017 WL 894474 (S.D. Ill. Mar. 7, 2017) (granting summary judgment to defendants on "failure to train" claim with reference to "manual" that established what training was provided).

App'x 490 (6th Cir. 2007) (granting summary judgment on § 1983 civil conspiracy claim against municipality) (citing <u>Monell</u>, 436 U.S. at 690); <u>Memphis</u>, 361 F.3d at 904 (finding that Plaintiffs had alleged conspiracy "with" city).

Plaintiffs—broadly alleging that <u>all</u> "Defendants" conspired to violate their constitutional rights, <u>see</u> Am. Compl. ¶ 272—do not explain how the municipalities themselves agreed to a common plan with Breakthrough.  Plaintiffs allege throughout their briefing that Detroit and Hamtramck failed to train their officers regarding the Code's requirements, but the Court cannot spin these statements into a plausible allegation that anyone other than individual officers shared in a willful objective to work toward the same "plan."  <u>Memphis</u>, 361 F.3d at 905.  The Sixth Circuit in <u>Memphis</u> found that a civil conspiracy charge against a city survived a motion to dismiss where the complaint could plausibly be read to allege a conspiracy "with" the city itself rather than only with its police officers.  <u>Id.</u> 904.  Not so here; Plaintiffs' imprecise framing of an allegation against all "Defendants" dooms even this inference.  As with the municipal Defendants in <u>Waste Servs. of the Bluegrass, LLC v. City of Georgetown, Ky.</u>, there are "not sufficient allegations from which it could be inferred that the City Defendants shared a single plan with others," and so "[t]his claim against the City Defendants must be dismissed."  20-cv-410-KKC, 2021 WL 1519991, at *9 (E.D. Ky. Apr. 16, 2021); <u>see also</u> <u>McGuire v. City of Sweetwater, Tenn.</u>, No. 319-cv-00014, 2020 WL 5569577, at *4 (E.D. Tenn. Aug. 17, 2020), <u>aff'd,</u> No. 20-6067, 2021 WL 3620449 (6th Cir. Aug. 16, 2021) (granting summary judgment on § 1983  claim against city, explaining: "Even taking Plaintiff's assertion of a conspiracy as true, it says nothing about the actions of the City or those who establish final policy . . . .").

34

### J.  Qualified Immunity for John Doe Defendants

To overcome a qualified immunity defense for Defendant police officers, Plaintiffs must allege (i) that there was a constitutional violation, and (ii) that "existing precedent 'clearly established' the right at the time of the alleged violation"—though they need not identify "a case directly on point."  Harcz v. Boucher, 763 F. App'x 536, 542 (6th Cir. 2019) (punctuation modified, citation omitted).  The Sixth Circuit "generally denies qualified immunity at the motion to dismiss stage in order for the case to proceed to discovery, so long as the plaintiff states a plausible claim for relief."  Marvaso v. Sanchez, 971 F.3d 599, 606 (6th Cir. 2020) (affirming denial of motion to dismiss on qualified immunity grounds).

Hamtramck argues that qualified immunity bars this action because there was no clearly established law putting the unnamed John Doe officers on notice that failure to adhere to the towing statute could result in constitutional violations.  Hamtramck Br. in Supp. Mot. at 12–17.  In their view, it was not clearly established that the alleged failure of officers to process paperwork pursuant to Mich. Comp. L. § 257.252 violated the Constitution.  Id. at 14.  They submit that it is ambiguous whether the vehicles were subject to the statute as "abandoned," obfuscating the supposed constitutional duty to enter the vehicles into the LEIN system.  Id. at 15–17.

Determining whether an alleged constitutional violation is clearly established "is sometimes difficult on the pleadings, since that inquiry may turn on case-specific details that must be fleshed out in discovery."  Myers v. City of Centerville, Oh., 41 F.4th 746, 758 (6th Cir. 2022) (punctuation modified, citations omitted) (affirming denial of qualified immunity).  Discovery is appropriate in this case.  Plaintiffs have plausibly alleged the violation of their constitutional rights to due process and to be protected against unreasonable seizures, in part because of non-compliance with statutes that served to protect those rights.  Non-compliance with such statutes

35

may indicate the violation of clearly established constitutional rights.  See Livingston, 151 F. App'x at 476 (denying qualified immunity where there was "some basis for [plaintiff] potentially showing that [defendant officer] somehow caused his vehicle to be towed despite its not meeting the statute's criteria for an 'abandoned' vehicle," explaining: "it is conceivable that [plaintiff] could present sufficient additional evidence to prove that [officer] acted objectively unreasonably in light of clearly established Fourth Amendment standards").  Here, too, "the case requires further factual development to evaluate whether the state defendants acted reasonably and competently under the circumstances."  Harcz, 763 F. App'x at 541 (reversing grant of motion to dismiss to defendant officers on qualified immunity grounds).  At this stage, the Court denies Defendant officers' qualified immunity defense.

### III. CONCLUSION

For the reasons stated above, the Court grants the motions to dismiss filed by CVS (Dkt. 105), McDonald's (Dkt. 107), and Virgirilli (Dkt. 110).  It grants in part and denies in part Detroit's motion for judgment on the pleadings (Dkt. 73) and Hamtramck's motion to dismiss (Dkt. 112) as follows: (i) Plaintiffs' claims for Fourteenth and Fourth Amendment violations and civil conspiracy survive against the John Doe officers, and the Fourteenth and Fourth Amendment claims survive against Detroit and Hamtramck, limited to the theories sustained above; (ii) Plaintiffs' First Amendment and Eighth Amendment claims are dismissed as to all municipal Defendants; and (iii) the civil conspiracy claims are dismissed as to Detroit and Hamtramck.  The Court also denies CVS's earlier motion to dismiss (Dkt. 60) as moot.

Hamtramck must file an answer to the second amended complaint within 14 days of the issuance of this Opinion and Order.  A scheduling conference will be noticed presently.

SO ORDERED.

Dated: September 16, 2022                          s/Mark A. Goldsmith
       Detroit, Michigan                           MARK A. GOLDSMITH
                                                   United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 16, 2022.

                                                   s/J. McCoy for Karri Sandusky
                                                   Case Manager